Thank you, Your Honors. My name is Vicki Merolt Buchanan. Here on behalf of the appellant, Juan Gutierrez-Arce. First of all, on the sentencing issue that we had, since the briefs were written, the Supreme Court has come down with Booker and Fan-Fan. And as I read those cases, we no longer have a sentencing issue. Mr. Gutierrez-Arce was sentenced under U.S.C. 21-841, which is the mandatory minimums, and the drug quantity was determined by the jury. And also, the government had filed an information on a previous drug-related narcotics transaction. So at the time he was being sentenced, the Buckling case was involved, but that case was overturned, and Booker did not constitute and not on the guidelines. Roberts. All right. Buchanan. So anyway, the real crux of this case is the statement made by Mr. Gutierrez-Arce after his warrantless arrest. It was really the only evidence that the government had in this case. In this case, as to him, there was no evidence that he had his fingerprints on the drugs or on the containers for the drugs. There was no videotapes. There were no audiotapes. There was no known association with Mr. Renteria. There were no – nothing found in his car. He was the driver. He was driving the Gold Crown Victoria. Mr. Gutierrez was, correct? Yes. And Mr. Renteria got to the drug deal by means of the Gold Crown Victoria, did he not? Not really, no. He came in and he parked his own forerunner in the parking lot. That's right. He apparently went right into the hotel, and then somehow there's – the surveillance was off for about 15 minutes. He somehow was dropped off at the hotel in the Gold Crown Victoria. Correct. Where is that evidence at the time of the motion as pressing? Mark Pontier says that So who actually testified that they saw that happen? It was in – it was Officer Nuss, I believe, was the – was the officer. Unfortunately, the motion to suppress did not attach to it. The police reports that had the timeline and the chronology in it. But, Officer, what happened is they – Kathy Lubrent also filed the declaration of the suppression motion. And the purpose of her declaration was to say that that was, in fact, Mario Renteria who came through the door at the same time that Gutierrez Arce dropped him off. And basically, that is the only tie that we have between these two people, is dropping him off at the hotel. So where is the Nuss declaration in the record? Do you know that offhand? There is no Nuss declaration. It is in his testimony during trial, but – During trial, but where was the motion to suppress? At the motion to suppress, there were only two declarations filed. I have a Nuss declaration in front of me. You do? Yeah, I do. On 48 D.R. or S.E.R. Yes, there is one. So the question was? I want to know who saw Renteria get out of Gutierrez Arce's car. As in terms of the record, that was before the judge at the time of the motion to suppress. There was, as I said, there was no evidence submitted by the government on that particular thing at that time, I don't believe, as to who got out of the car. And why are we assuming that happened at all? I believe that it was in – it probably was in the moving papers of Mr. Gutierrez Arce, but that was not based on actual evidence. It was based on his review of the police records. Well, Nuss says in his declaration, he sees two adult male individuals exit the car with a male juvenile, ending at the radio store. That's later. Which is later. It doesn't identify the two – it doesn't identify the second individual. And – and – and Partier says it's information and belief. And Kathy Lubrin says – and the reason I'm focusing on this is it seems to me that that is the – you know, one time the two of them were together, and if it happened – If in fact it was him. And that Mario apparently went directly from there to the drug sale. So if there's – if there's – if that didn't happen, then we're into much considerably looser connections between them, simply that they're both in this neighborhood at the same time during the day. I – if you look at the record, it appears that the trial counsel said something that he, for purposes of argument, he would agree that it was Mario that was dropped off. But I don't think that there is any proof. As I read the record, I couldn't see anything definitive to say that the person that got out of the Gold Crown Victoria was, in fact, Mario Renteria. But I'm asking you something else. What – is there any firsthand evidence that anybody got out of the Crown Victoria? I recall one of the surveillance officers, but maybe it was me reading the police reports that are not before the Court, and reading through the motion papers that are not before the defense counsel. All right. Well, so assuming for the sake of argument that, in fact, there was evidence before the district judge that Mario was dropped off and exited the Crown Victoria, why isn't that enough? Well, it's not enough because he's not like the driver. He's – maybe he met somebody over at Del Taco and said, oh, hey, can I get – do you mind giving me a lift? Mario said, do you mind giving me a lift to the – to the hotel? If I take a colleague from work over to the Westin Plaza Hotel. Except for the fact that just prior to this, the Gold Crown Victoria had pulled into the hotel parking lot, and it aroused the suspicion of the surveillance officers, correct, by the way it drove. I mean, it went past several parking places, then went down to the end of the road, as I understand it, and turned around, and then just waited for several minutes. Nobody got out, and then went back out, and they said that looks like counter-surveillance. Yes, that's counter-surveillance. Now, I don't believe that that – even if that is counter-surveillance, I don't think that one incident is enough for probable cause. When you look at the cases – No, and I'm not suggesting it is, but you said there was no connection. Well, there's that. There was that previous incident with the Gold Crown Victoria doing the so-called counter-surveillance, correct? Correct. Okay. Yeah. Well, he drove into the parking lot. And then in that – somewhere in the 15 minutes at that point in time, we believe that Mario, according to the same officer, Patier, is also inside the Ramada Inn at that point in time, because he walked into the Ramada Inn from his forerunner at some point in time. I mean, it's possible. Renteria goes into the Ramada Inn to look around for people. At the same time, the Gold Crown Victoria comes in to do counter-surveillance. Then somehow they hook up, and whatever they do, and then the Gold Crown Victoria comes back, and Renteria gets out of the Gold Crown Victoria and goes in and sells the drugs. That's possible. Yes. I mean, that's what the record looks like, isn't it? But the person who dropped – the person who was dropped off or the person that Kathy Lubrand saw come through the lobby was carrying no drugs. I mean, they were not carrying anything when he came in. Well, maybe or maybe not. I mean, there was two pounds of drugs. He could have had them under his shirt. I mean, it's not like he had a box of drugs or an envelope. The drugs are in this envelope, but he could have had them under his coat or anything of that nature. Isn't that correct? I mean, it's only two pounds. Probably. Yeah. So – but that's – I still believe that that's not sufficient at that point in time. You know, if you – the only case that it's even remotely close to, and it's cobbling the whole probable cause based on the presumed fact that Mario Renteria got out of the car instead of Bernardo Renteria, if you look at Officer Garcia's testimony, which is the statement, you know, that we're trying to suppress, Officer Garcia says the one thing that Juan Gutierrez Arce testified to was that he did not see Mario at all during that day. So that was one of the testimony that is a part of Garcia's trial testimony. So I think, you know, I don't know that there's even enough to know who got out of that particular car at that time. We do know that the Gold Crown Victoria was around the area for – off and on for about three hours. As I understand the record, the Gold Crown Victoria dropped off Mr. Renteria. Uh-huh. And then an agent in the lobby saw him come out of the Gold Crown Victoria into the lobby and through the lobby. Isn't that correct? She saw him come through the door. She did not see him get out of the Gold Crown Victoria. At the same time, were they – they sit together on – you know, when they put their logs down as to what time the suspect walks through the door or whatever. It was based on the timing there. Do you want to save some time for rebuttal? Yes, please. Could you tell me at the outset what record you're looking at with respect to the motion to suppress? I'm really quite baffled at this point. Well, I believe that the record that this Court should look at is the record at the time of the suppression hearing, not the trial. Okay. And what is it? It's three declarations. Is that right? Well, that is – that's correct, although the parties, because the facts were undisputed, both parties submitted what was their statement of facts. I do think it's permissible to rely on the statement of facts that the parties submitted, particularly at least defendant's statement of what the facts were. I mean, this was an undisputed factual record at the time of the suppression hearing. And so when the defendant stated in his briefs at page ER 8, 11, and 15 that Renteria got out of the gold crown Victoria, the district court was entitled to believe that. When defendants said at ER 74, we have Mr. Gutierrez true dropping Mr. Renteria off at 357, I think the district court is entitled to credit that, that that's a fact, even though there was no declaration submitted on that. I mean, part of the problem was there was no evidentiary hearing in this case, although there were declarations for three officers submitted. So you think we can look at something other than the three declarations? I do think in this circumstance where the record is undisputed and it's defendant of – It's not undisputed. This isn't there. It just doesn't exist. Well, I disagree when the defendant himself is the one that says this is a fact. Well, in a brief, though, it's much different. It's much different from – if you say – if a counsel says in a brief, it's much different from saying it and conceding it for stipulation or for the purposes. I mean, I take your point, but we're in an odd situation where we don't have an evidentiary hearing, we don't have factual findings, and yet the pivotal point seems to be now disputed. Well, it's disputed now, but it wasn't disputed then. That's the problem. I mean, there could have been an evidentiary hearing in this case. The defendant certainly was entitled to have one, but the defendant chose not to have one, instead accepted the facts from the DA reports as true and simply said on these facts there's no probable cause. And it was defendant who asserted – You might have thought that the government was going to introduce the report, but you didn't do it. I mean, I think it would have obviously been better if the government had introduced it. It would have been better if the declarations in this case contained a full recital of everything that was observed, whereas it's clear from the declarations all that they include are things that aren't in the DA reports, so they're partial declarations. So, I mean, I think there certainly could have been a better evidentiary record here, but I think it's up to defendant if defendant wants to challenge that to do so in the district court. And rather than do that in the district court and ask the district court to make factual findings because there was a disputed record, to the contrary, defendant asserted that the facts – asserted these are the facts that you should rely on in ruling on this, and one of those facts was that Renteria got out of the Gold Crown Victoria. And, again, specifically at the hearing, at least there was some dispute initially – and this is the ER 811 and 15 section – there was some dispute about whether defendant was driving the Gold Crown Victoria at that time. Then you have the declaration of Special – of Officer Nuss that was submitted, which indicated that defendant was identified as the driver at 403 at the Del Taco, and this is at ER 48. And so at that time, at the hearing, you have the defendant at ER 74. As I said, quote, we have Mr. Gutierrez two-dropping Mr. Renteria off at 357. Without that, do you think you have probable cause? I do actually think there would be probable cause without that. I mean, I do think it's – it is an important fact in the totality of the circumstances, but I think if you look at this transaction, first of all, it's – it's important to recognize that there really was, at the time they made the arrest, undisputed evidence that Renteria was involved in a drug transaction. The question was whether the defendant was connected to that transaction. And so I think it's important to look at the conduct in this case. You have the first drop – the first meeting, which was approximately 3.33 p.m., in which Renteria, or vehicle matching Renteria's description, enters the – the parking lot at the Ramada Inn, followed shortly thereafter, which is what Special Agent Potthier indicates at ER 29, by the Gold Crown Victoria. The Gold Crown Victoria drives slowly, doesn't park in its spaces, even though they're available. The space that it – the place where it eventually parks has a view of the entrance of the hotel, and the driver stays there for a few minutes without getting out, and then leaves. It can't be that. I've never seen the two of them together anyplace. I mean, people go to hotel parking lots, and people drive around areas. He was with other people. He was doing other things later in the day. It seems without – everything seems to turn on whether, in fact, this first event happened. Well, I mean, again, I do think it's permissible to look at that, but I would actually respectfully disagree that it's necessary here. I think when you look at the facts of this case, the only times that the defendant was on the actual Ramada Inn property was directly tied to when there was a transaction or a Schedule B in this case. You have the first 333 time period, the defendant's at the Ramada Inn. You have the drop – well, I guess, assuming we don't have the drop-off, the next time he's there is at the 630, which is around the time that the four pounds are being dropped off. Again, he's on the Ramada Hill. But I thought we – it was plain that at 630 that the drugs were gotten from the next-door hotel. Well, I – well, I disagree that it's plain that they were gotten from the hotel, but I do believe that the testimony was – I apologize. There was no testimony. But the evidence that was before the Court indicated he came from the area of the Ramada – excuse me, the Budget Inn. There's no indication of where he came from or how the drugs got to that point. But I think what's important is that when this transaction is going down, the defendant is at the hotel again. So you can – I mean, basically, you're just – you're making a proximity argument, which I think is stretching it quite a bit. In other words, anytime somebody drives slowly around a hotel, happens to park around the same time a drug deal is going down, they're subject to arrest. I don't – what's your best case that says that's sufficient probable cause? Well, I mean, I disagree that – respectfully, that that's – No, but I have to – you know, you read these cases, you start thinking. Well, that's exactly the way I was driving around a hotel the other day. I hope nothing was going on there. Well, I mean, this is – I passed parking spaces because I was trying to find one that was close to a door. I had my young son with me, you know. Well, I mean, this Court in Ocampo and Rodriguez is, again, innocent conduct can often – It looked like counter-surveillance, right? So is that probable cause? Well, I mean, I think when you – it's important to look at – I think this Court's decision – this Court's case in Hillison is instructive because that was a case that involved what you do with association. Because when you have some evidence of association, that is evidence, but it's not itself sufficient evidence to establish probable cause. So Hillison says you need something probable – you need association plus. And two things that the – this Court identified in Hillison were that it was contemporaneous with a criminal activity. That's not the type of activity that would be engaged in in secret. Here you do have the defendant's presence at the hotel tied directly to the meetings in this case. I mean, I think it's important to recognize the entire three-hour span, defendant is only once. But you couldn't – you wouldn't have probable cause to arrest everybody at the hotel that was in the proximity, right? That's true. But defendant is not – Or anybody who was driving in the – driving along around that time. That's true. But the defendant was seen not at all times at the hotel. The times that he's seen are specifically tied to the meetings in this case. He was only once seen during this entire three-hour period that wasn't directly tied to a meeting. So he – during the rest of the three hours, he wasn't getting close enough to the surveillance. I mean, it's important to recognize that the surveillance was at the hotel, and except when Nuss – The difference in Hillison is that they were – they were together. In other words, the association was that they were in one place at one time. They were talking to each other. Here you simply have people who were in the same vicinity during the same day and leaving aside this question of whether they was dropped off. Well, I mean, I still think – I mean, I guess – They weren't associating. That's what they weren't doing. They were not associating with each other. Well, I disagree that a reasonable officer having witnessed the Crown Victoria's conspicuous timing around the meetings in this case would – I'm just questioning your reliance on Hillison at this point. Because at Hillison, they – what they were doing was dealing with each other. They were talking to each other. They were – they were – they had some connection to each other. Here is what they weren't doing. Well, I definitely agree. I mean, in Hillison, they were – they were giving – the defendant there had given rise to the individuals, and there was some interaction between the two hotel rooms. So, I mean, I – there was direct association. But the point – this Court's point in Hillison was to talk about, in addition to that, when association can get you probable cause. Right. But first there has to be association. But I think that – We don't have association, except if first – in – at the very beginning. Well, I – see, I respectfully disagree because, I mean, I think, again, the timing of when the defendant's there is good evidence. I think when you look at the counter-surveillance, the First Circuit in Martinez-Melinda has indicated counter-surveillance, it's well settled, is evidence of knowing participation in a crime. And here, this wasn't some unreasonable interpretation of what the officers saw. I mean, it may be that there was an innocent explanation for that, but that doesn't detract from probable cause. This is the type of behavior that would be consistent with counter-surveillance. This was a large drug transaction, which is one in which you would expect counter-surveillance activity. So I think that does suggest participation. You do also have the tandem driving in this case. Although it was a brief period of tandem driving, it was also conspicuously timed. Doesn't tandem driving usually mean that two people are going together from A to B place, which is not what they were doing here? Because, I mean, why they drove – followed each other a half a block, we don't know. But they didn't start from the same place. They didn't go to the same place. Well, I think it's important to look at what happened in the entire context. What you have is at 539, both Renteria and Defendant leave their respective positions. Renteria leaves the Ramada in a parking lot, and Defendant leaves the Del Taco, where he's now back at. And this is both happening at 539. They pass each other going the opposite direction. Defendant pulls a U-turn and falls in behind the vehicle. Now, it is true that they, after driving in what the officer said was in tandem for a short period of time, they split up. But I think there's two points to that that doesn't dissuade the kind of inference that you get from that conduct. Well, what is the inference? There was no evidence that they were talking to each other on cell phones. There's no evidence that they were going to the same place. So what's the inference? Well, I respectfully – I mean, there is no direct evidence that they were seen talking on cell phones. But you do have at ER-12, at 515, which is shortly before that, there's an individual seen in Defendant's car with a cell phone. You do have at ER-10, you have Renteria was called by the CI when he's in the parking lot, which I think it's fair to infer he was called on a cell phone. I mean, there's no other way he would have been called in the parking lot in that circumstance. So, I mean, it is – they did have cell phones. They could have been talking. It doesn't negate the tandem driving, the suspicious aspect of it. Secondly, although they split up at that point in time, neither one is seen for 20 minutes after that, particularly when you have some suggestion of counter-surveillance previously. This could have simply been a counter-surveillance move. And again, Renteria doesn't reappear until 20 minutes later, and this is at ER-10 and 13. So, I mean, I don't think this dissipates the suspicion of the counter-surveillance, particularly when you look at it as that they left both at 539 from their respective places and the conspicuous behavior in the U-turn. I mean, it particularly takes on added weight, obviously, if the Court looks at the previous drop-off with Renteria by a Defendant, because it's clear at that point that they know each other. And so it makes sense at that point that it's tandem driving. And again, the government believes that's appropriate. But I do think this is one factor when you combine it in the totality with the counter-surveillance, the being there at the time of every transaction, and in fact only once during this entire period of time in which there's not a meeting scheduled as Defendant is seen in the kind of surveillance area, which means he doesn't have a reason to be at the Ramada Inn during that period of time. It's only right around these meetings that he has a reason. I don't think we've ever had a case that went that far. You may have enough for a Terry stop, I'll grant you. But I don't think we have a case where there's no proof of a – I mean, leaving out the drop-off, which is another question, where there's no proof of association and an arrest is made based on pure observation of counter-surveillance. Have I missed it? Well, I mean, you know, I think Ion Mesa is a somewhat close case. Which one, sorry? Ayon-Mesa. It's – I don't believe it's cited in the briefs. It's 177F3rd1130. That case involved an officer who sees three individuals he believes are connected walking together in an airport. He winds up questioning them. They give statements which indicate that they're not connected and the officer doesn't believe them. He finds drugs and sees what he believes to be drugs in the bag of one and he arrests all three. And this court indicated because there was evidence they were acting in concert in that circumstance, the probable cause based on the drugs transferred to the – But there you have the association proven because he sees them together. Well, but if he doesn't see them walking together, what he sees them is spaced out in the airport looking at each other, which suggests that they're together. Is that the Honolulu case? That's the Honolulu case. Yeah, okay. So, I mean, there was no direct evidence. But they had the bag in that case, didn't they? Excuse me? They observed a suitcase with a bag, right? Well, that's where the officer observed the actual drugs. But it was only the bag of one individual and he arrests all three. And the question was how does he have probable cause? Right. But he sees the drugs. He thinks they're drugs. He's got the bag. And then he sees the people they're connected with, if I recall the case correctly. Well, I actually respectfully think it was actually the reverse order, that he saw the walking, what he believed, together first. And then eventually after he stopped and talked to them, he saw the drugs in one bag. But, I mean, I do think what that suggests is if you observe behavior that an individual sees is associated or concerted activity, that you have probable cause. I think the Second Circuit decision in Patrick, and that's 899 F. 2nd 169, is another similar case. You have two people walk into a customs checkpoint at the same time. Right. But those are customs and airport cases, too, which are, I think we made a point in the Honolulu case that the name has escaped me, that it was, in fact, at an international terminal. Well, I mean, I do think, I do recall that the Court made a point that where they were coming from was a drug-sourced city. But, I mean, ultimately what supported the probable cause for the two other individuals was their acting. Coming from Guam, weren't they, or something? Are they? You know, I apologize. I don't remember where the city was that was indicated as a source city. But I do think what supported in Ayan Meza and also in Patrick is that you had acting in concert when combined with probable causes of one and the probable cause transferred to the other. I mean, I think in Howard's another good example. That's at 758 F. 2nd 1318. That's the case in which you have someone who's inside a post office trying to cash forged money orders. You have an officer, an officer who, a postal inspector who goes there, observes someone outside who the officer believed was suspicious. He believed, based on his training experience, that the kind of masterminds of these crimes often send females in to cash the checks, which was the person involved in this. He sees someone talking to that individual in that car, then goes inside and talks to the person who's alleged to be cashing the fraudulent checks. And based on the concerted activity there, the connection via the person who's trying to cash the checks through the intermediary, the officer arrests the person outside in the car, and this Court indicates that there's probable cause to do so. It's the connection that was established that was inferred from the behavior there. So I do think you don't have to have direct evidence to make the associational connection. And it's important, although there's not direct evidence in this case, as there was in Hillison, you still have the association plus that was in Hillison. I mean, I think if you look at the First Circuit's case in Martinez-Molina and the D.C. Circuit's in Hallaman, I mean, I think there they looked at, in order to determine what to do with association plus. I just see I'm out of time. Roberts. Yeah, yeah. You're over, but go ahead and finish your thoughts. In those cases, what the courts have also looked at, in addition to kind of mentioning the Hillison factors, is was the association momentary, was it random, was it casual? And I don't think over this three-hour period in which it's specifically timed to the meetings in this case, it would be fair to say that it was those things. And so I do think even if you didn't look at the conduct involving the drop-off in this case, there would be probable cause. But I don't think, given it was defendant who asserted that he dropped off Renteria, that it's impermissible to look at that. And I think when you add that to the mix of probable cause, there was more than enough in this case. If the panel doesn't have any further questions. Roberts. No, but I think for the sake of our audio tape, we jumped in with questions before you had a chance to identify yourself for the record, Mr. Silver. So why don't you go ahead. I apologize. No, no. You took it away from you. May I please record Eric Silver on behalf of the United States. Thank you. We'll give you two minutes for rebuttal. Okay. Case dissert will be submitted. And we'll proceed with the argument on Tidwell versus Calderon. Thank you.
judges: Thomas, Berzon, Mahan